270 Cal.App.2d 31 (1969)
Estate of C. MARIE BECKER, Deceased. NELLE M. PRATT et al., Petitioners and Respondents,
v.
THOMAS C. LYNCH, as Attorney General, etc., Objector and Appellant; EMILY BARBARA BECKER, Claimant and Respondent.
Civ. No. 32679. 
California Court of Appeals. Second Dist., Div. Two. 
Feb. 21, 1969.
 Thomas C. Lynch, Attorney General, and Carl Boronkay, Deputy Attorney General, for Objector and Appellant.
 Poindexter & Barger, Henry J. Merdink and Alfred B. Doutre for Petitioners and Respondents.
 Smith & Davis and Frank R. Davis for Claimant and Respondent.
 FLEMING, J.
 The Attorney General, as protector of charitable trusts, appeals a judgment determining that $25,000 in the estate of C. Marie Becker passed by intestacy to Emily B. Becker, the testatrix' next of kin, and not to a trust created by the will. The principal issue is whether the testatrix' will disposed of all her property or only part of it.
 At the age of 82 Miss Becker wrote the following holographic will:
 "Last Will of C. Marie Becker"
 "Aug 2, 1960"
 "C. Marie Becker"
 "1351 N. Orange Drive"
 "Hollywood, Calif."
 "I do hereby make this statement that I am of sound mind and judgment and make my last will and testament as follows: All income derived from my several bank accounts, also all income derived from all my stocks to be paid to my sister Emily B. Becker as long as she lives, and after her death all above incomes to be paid to Braille Institute of America, Inc., 741 North Vermont Ave., Hollywood, California, and hereby appoint upon my death Security First Nat. Bank, 6777 Hollywood Blvd., Hollywood Calif. to act as Executor and Trustee of all above properties without bond."
 "C. Marie Becker,"
 "1351 N. Orange Dr., Hollywood, Calif."
 There was no evidence that at the time Miss Becker wrote her will she had any substantial property other than savings accounts and stocks. In January 1961 she purchased a single-premium nonrefundable annuity for $10,000. In February 1961 she purchased a second annuity for $10,000, and in April *33 1961 a third for $8,035. In March 1964, using funds from the sale of stocks and funds from her savings accounts, she purchased a single-premium nonrefundable annuity from Occidental Life Insurance Company for $41,500. From this last annuity Miss Becker collected the first monthly installment of $650 on 1 April, and then died on 17 April 1964. Her estate was appraised at $6,425, of which $6,345 consisted of six savings accounts and $80 of miscellaneous personal effects.
 The administratrix of the estate sued Occidental to recover the $41,500 paid for the annuity on the ground Miss Becker had been incompetent at the time of its purchase, and the suit was settled for $25,000. This is the money which the trial court determined had not been disposed of under Miss Becker's will.
 On appeal the Attorney General contends that the bequest in the will amounted to a general legacy of all assets derived from savings accounts and stocks and hence the money recovered from Occidental passed under the will into the trust. Additionally, he argues that even if the bequest is considered a specific legacy, it did not adeem but continued in being in the form of the $25,000 settlement. In opposition, respondent Emily B. Becker contends the money was the product of an unliquidated claim of the estate, not disposed of by will, and therefore passed to her under the laws of succession.
 [1a] In our review of the case we reach the result sought for by the Attorney General but on somewhat different legal reasoning and under a somewhat different interpretation of the will.perhaps some brief digression on fundamentals may help explain our views.
 Under our system of law disposition of property after death is a privilege which the individual is entitled to exercise freely. In permitting the individual to dispose of property as he wills rather than having it disposed of under fixed rules created by the state, as do many of the civil law systems, we necessarily require the courts to honor the wishes of the decedent and follow his directions. This process is generally referred to as carrying out his intent. By intent we mean, narrowly, what the testator had in his mind, and, broadly, how he desired to dispose of his property. Generally, relevant intent is what the testator had in mind at the time he made his will, but changed circumstances between the time of the will and the time of its proof often overrun the particular events the testator had in mind and force the courts to consider *34 the broader implications of the testator's disposition. Because of the inherent difficulty in relating past intent to present disposition, courts take a liberal approach to the problem and do not require the same precision and accuracy in the disposition of property by will that they require for disposition by grant deed or gift.
 Yet courts cannot construe wills solely on the basis of the testator's intent, entirely divorced from the language and expression used in the testator's will. Intent must be manifested through words or conduct; inarticulated intent and unexecuted intent do not provide a suitable foundation to effectuate a legal act. Even where we may reasonably deduce probable intent we still require some appropriate expression of that intent and some degree of consistency between the intent and its expression before we can conclude that intent has revealed itself in conduct. This requirement is basic to any system which permits the testator to dispose of his property on his own terms rather than on terms established by the state, because if we regularly permit the courts to range too far afield from the expression of the testator's intent, then we run the risk that courts will substitute what they think the testator's intent should have been for what it actually was. While judges may pan the stream for golden nuggets of intent, they are required to stay within the banks of the testator's actual expression.
 One other legal fundamental is relevant, the preference in favor of testacy expressed in Probate Code section 102: "The words of a will are to receive an interpretation which will give to every expression some effect, rather than one which will render any of the expressions inoperative; and of two modes of interpreting a will, that is to be preferred which will prevent a total intestacy."
 With these legal considerations in mind we return to Miss Becker's will. We think it a reasonable inference that she intended by her will to dispose of her entire property and to put it all into a testamentary trust with a life estate to her sister and the remainder to Braille Institute. We infer this from the apparent fact that at the time she wrote her will she did provide for the disposition of all her then existing property.
 This brings us to the critical question in the case: was her intent expressed with sufficient clarity to enable us to carry out her purpose? Here we are confronted with the phenomenon of the garrulous layman who says too much. If Miss *35 Becker had merely written that all income should go to her sister for life and then to Braille Institute, construction of her will would present no problem. But as so often happens repetition and tautological duplication merely call up the ghosts of uncertainty which they were designed to dispel. Miss Becker, after disposing of "all income," proceeded to elaborate her meaning by adding the words "derived from my several bank accounts, also all income derived from my stocks."
 To state the problem in legal terms: are the words which follow the expression "all income" words of limitation which qualify the preceding bequest, or are they words of enlargement which express the idea of part of the whole? If the words "derived from my several bank accounts, also all income derived from my stocks" are construed as words of limitation then they restrict the bequest of "all income" to income derived solely from those two particular sources. On the other hand if the words "derived from my several bank accounts, also all income derived from my stocks" are construed as words of enlargement then the words merely indicate two sources from which such income may be derived and do not exclude other sources of income.
 The problem before the court has been summarized in Page on Wills (New Rev.), section 33.34: "Where property is given by a general description, and a more particular description of the same property is attempted, and the two descriptions are inconsistent in whole or in part, the courts will give effect to the one or the other in accordance with testator's intention, as ascertained from the entire instrument."
 "If the particular description appears to be given as an addition or supplement to the general description, merely for the purpose of identifying the property further, or by way of example, the general description will not be cut down by the words of the particular description."
 This quotation emphasizes the fact that in the construction of a particular holographic will general rules only serve as an aid to the interpretation of the document in its particular setting. Reading Miss Becker's will and keeping in mind the nature and extent of her property at the time she wrote it, we construe the words which follow the expression "all income" as words of enlargement which do not restrict or limit the scope of the bequest, "all income." We interpret the enlarging words as in substance a communication by Miss Becker to her executor telling it what property she had and where to *36 look for it. This interpretation is fortified by the final clause of the will, which appoints the bank to act as executor and trustee of "all above properties." It appears highly unlikely that anyone would appoint an executor to take charge of part, but not all, his property. We conclude that Miss Becker intended by the will to dispose of all income from her entire property, and that her intent was sufficiently expressed to achieve its purpose. Under our interpretation the sense of the will, punctuated to reflect Miss Becker's intent, reads: "... all income [derived from my several bank accounts, also all income derived from my stocks] to be paid to my sister, Emily B. Becker ..." The matter within brackets we construe as words of enlargement which itemize some but not all the testatrix' property and which indicate some but not all sources of income which she bequeathed under the will.
 Our construction of the will is comparable to that in two other California cases. In Estate of Douglass, 70 Cal.App.2d 279, 280 [161 P.2d 66], in the bequest "all the rest of my personal effects of every kind and description, including all of the rest of my silver, and all of my linens and china, I give and bequeath to my beloved daughter," the court interpreted the words "including all of the rest of my silver, and all of my linens and china" as being words of enlargement and not words of limitation, and held that the bequest was not restricted to silver, linens, and china but included automobiles as well. In Estate of Fuller, 135 Cal.App. 781, 784 [28 P.2d 399], in the bequest "all monies stocks or real estate that stands in my name at the time of my death," the court interpreted the phrase "that stands in my name at the time of my death" as words of enlargement and not words of limitation and held that all property of the testatrix passed under the will, even that standing in the name of a trustee at the time of her death.
 [2] A subsidiary issue raised by the Attorney General involves the trial court's determination that the corpus of the trust go to Braille Institute, rather than merely its income. Here again it is clear what the testatrix intended--on the termination of the life estate to apply the income from her property to charitable uses. Although the will, read literally, makes the bank the trustee of the property and Braille Institute the beneficiary of the income, this description misconceives the normal position of a charitable organization in a charitable trust. Conceptually, Braille Institute is not the beneficiary of a charitable trust but is itself the trustee of *37 funds which it holds for charitable uses. It is not Braille Institute but rather the recipients of its welfare who are the true beneficiaries of the charitable trust. Accordingly, the trial court properly determined that at the conclusion of the life estate the property should go to Braille Institute in trust to use the income for charitable purposes.
 [1b] We conclude that the legacy in the present case was a general legacy of the testatrix' entire property in trust for the testatrix' sister during her lifetime, with remainder to Braille Institute. The judgment is reversed with directions to the trial court to enter judgment in accordance with this opinion.
 Roth, P. J., and Herndon, J., concurred.